# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | | |
|---|---|---|
| WEYMAN L. ARMSTRONG, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | Case No. CV407-137 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| *Commissioner of Social Security*, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>REPORT AND RECOMMENDATION</u>

On September 21, 2007, Weyman L. Armstrong filed a complaint with this Court appealing the Social Security Commissioner's denial of his application for disability benefits. (Doc. 1.) For the reasons set forth below, the Commissioner's decision denying benefits should be **AFFIRMED**.

## I.    BACKGROUND

Claimant Armstrong is a fifty-eight-year-old who has completed three years of college and holds a two-year associate's degree in business.

(Doc. 9 at 4.) He served in the active-duty military from June 13, 1969 until December 1, 1971. (Tr. 77.) He worked as a traveling salesman in the rigging and lifting industry from 1976 to 2001. (Tr. 84.) He worked for and held some ownership interest in the company Lift All for fourteen years, before beginning to work for Consolidated Rigging and Lifting in the 1980s, where he remained until 2002. (Tr. 462-63; 440-42; 72.) On February 24, 2004, claimant filed his application for disability insurance benefits, alleging that he became disabled on January 28, 2002. (Tr. 77.)

## A.    Procedural History

The Social Security Commissioner denied claimant's application, first on July 8, 2004, (Tr. 58), and again upon reconsideration on February 17, 2005.   (Tr. 54.)   On May 12, 2005, claimant filed an untimely written request for a hearing, (Tr. 49), and showed good cause for the delay.   (Tr. 15.)   An Administrative Law Judge ("ALJ") held a hearing on September 18, 2006.   (Tr. 430.)   On November 24, 2006, he issued a decision denying claimant's benefits application.   (Tr. 12.)   On July 25, 2007, following the appeals council's rejection of claimant's request for review, the ALJ's decision became the final decision of the

Commissioner. (Tr. 5-7.) Claimant then filed a complaint in this Court, contending that the ALJ's decision is incorrect as a matter of law and is not supported by substantial evidence. (Doc. 1.) Accordingly, the Court must review claimant's medical history in some detail.

## B.    Medical Records

On April 12, 1997, claimant presented to Southeast Georgia Medical Center complaining of dizziness and numbness in his right arm and leg. (Tr. 404.) He was treated by Dr. Albert Henderson, who diagnosed him with having accelerated hypertension. (Tr. 403, 405.) His blood pressure was monitored, and he was stabilized and sent home a few hours later. (Tr. 405.) Several months later, in December 1997, claimant returned to Southeast Georgia Medical Center, again complaining of numbness, this time in his left hand. (Tr. 394.) He was again treated by Dr. Henderson, who ordered a cranial CT scan. (Tr. 392.) Radiologist Hubert Manning stated that his findings were "consistent with an ischemic stroke." (Tr. 394.)

On the morning of June 25, 1998, claimant suddenly "felt like he was dying" and believes he lost consciousness for some time. (Tr. 422.) Afterward, he had residual numbness and weakness in his right leg and

arm. (Id.) As a result, he was admitted to St. Joseph's/Candler Hospital. (Id.) Although doctors suspected that he was suffering a cardioembolic stroke, the medical tests that were performed revealed "normal" findings. (Tr. 427-28.)

Claimant reports that he was admitted to St. Joseph's/Candler on August 12, 1998 after he experienced a seizure, but the record is devoid of any official documentation of the episode. (Tr. 88.) He further reports that he underwent tests, x-rays, MRI's, and CT scans, and that he remained admitted there until August 17. (Id.) After his release, he saw Dr. Julia L. Mikell at the Neurological Institute in Savannah. (Tr. 275-76.) Following a visit on October 13, Dr. Mikell was "delighted with his stability" and noted that he was doing "extremely well" and was walking "functionally," although his left side was still numb. (Tr. 275.)

His progress was short-lived, however. After forgetting to take his antihypertensive medications on the morning of August 13, 1999, claimant took the morning dose he had missed at the same time he took his evening dose. (Tr. 419.) The following morning, after taking his normal morning dose, he "developed a flushed sensation in his face and a lightheaded feeling," which lasted for about 30 seconds. (Id.) Worried

that he may be suffering another stroke, he presented at Candler Hospital, where a CT scan of his brain showed "a chronic ischemic stroke." (Id.) Additionally, the CT scan revealed "a chronic lacunar stroke in the region of the right thalamus." (Id.) Dr. E.F. LaFranchise ultimately determined that the morning episode was due to a sudden change in claimant's blood pressure when he took his medication, and he was released in stable condition the same day. (Tr. 419, 421.)

On November 11, 1999, claimant, whose driving had already been limited, underwent a cognitive driver's inventory test at Candler Hospital (as an outpatient). (Tr. 417-18.) Claimant passed the test over-all, failing only two of the eight sub-tests: the visual reaction differential response sub-test and the visual reaction differential response reversed with distraction sub-test. (Id.) During claimant's November 30, 1999 visit with Dr. Mikell, she noted that claimant had made a "wonderful recovery," and although he still felt "some dysesthesis[1] in his left leg . . . there [was] no weakness." (Tr. 274.)

---

[1] Dysesthesis is when abnormal sensations are experienced in the absence of stimulation, or numbness. Stedman's Medical Dictionary 531 (26th ed. 1995).

On December 22, 1999, an electroencephalogram (EEG) resulted in abnormal findings which were clinically interpreted as "potentially epileptogenic." (Tr. 184.)

Dr. LaFranchise, of the Neurological Institute in Savannah, performed a neurological examination on claimant on December 7, 2000. (Tr. 273.) He noted that claimant had been diagnosed with a seizure disorder and concluded that the neurological examination was "normal except for a partial left visual field defect." (Id.) On January 23, 2001, Dr. Judith M. Piros of Ophthalmology Associates evaluated claimant, who said that "he [had] difficulty seeing to the left," and she concluded that claimant had "no peripheral field of vision to the left of midline in both the right and the left eyes, and thus [had] lost a full fifty percent of his field of vision." (Id.) She recommended that he not drive "not only because of his loss of field, but also because of his seizures." (Tr. 219.)

Although the record references two seizures experienced by claimant in 2001—one in April and the other in September—no medical records document these seizures. In his disability report completed February 26, 2004, claimant reports that he was admitted to Memorial Family Practice in April 2001 after he "experienced a seizure and passed

out." (Tr. 87.) The September seizure is referenced by Dr. Mikell in a report she made after seeing him in November. (Tr. 272.)

During the November visit, Dr. Mikell noted that claimant was "having a lot of difficulty," which she attributed to his frustration from not being able to drive and the seizure he reported experiencing in September. (Id.) She explained, "I am afraid there is not much more we can do but we will just watch his Dilantin[2] level very carefully." (Id.) She also hypothesized that he "has some mild cognitive deficits" but noted that she had not tested him formally. (Id.) About a year later, when claimant returned for a follow-up visit with Dr. Mikell, she noted that he "has had no seizures" and that his visual field cut still existed but was "slowly getting a little better." (Id.)

In November 2004, and in February, March, October, and November of 2005, as well as February and May of 2006, claimant was seen by Dr. Lawrence A. Adjei at Alda Medical Center for routine visits, medication refills, and, occasionally, for blood work.[3] (Tr. 256-67.) On

---

[2] Dilantin is an anti-epileptic drug.

[3] Every two months between October 2002 and January 2004, claimant was also seen by Dr. Woolen at Savannah Nephrology to have his hypertension and his prescription dosages assessed and adjusted. (Tr. 143-50.)

June 16, 2006, he presented to Dr. Adjei with "persistent bleeding from [a] small wound on the lateral region of the left hip." (Tr. 268.) He had accidentally pulled off an existing scab and had been unable to stop the bleeding despite applying pressure to the site for two hours. (Id.) Dr. Adjei noted that claimant was on "long term Coumadin therapy," which was likely causing the problem. (Id.) He sent claimant to the ER at Effingham County Hospital for suturing of the wound. (Tr. 269.)

On December 8, 2004, Dr. Piros of Ophthalmology Associates performed another evaluation of claimant, this time upon referral by DAS. (Tr. 213.) In her assessment, Dr. Piros stated that claimant "had a cerebral vascular accident which resulted in severe vision loss with a complete left hemianopic defect. He has otherwise a normal ocular exam in both the right and left eyes." (Id.)

On January 29, 2005, claimant presented himself to Southeast Georgia Health System's Brunswick Campus and reported that he was unsure whether he may have had another seizure. (Tr. 364-90.) He stated that he had forgotten to take his blood pressure medication the morning before, so he took the morning dosage along with his evening dosage. (Tr. 375.) The next morning he had taken his usual dosage and

began to feel nauseated, faint, and felt pain in the middle right side of his back. (Id.) He was admitted to the ER and remained there for several hours until he began to feel better. (Tr. 364-90.)

On May 24, 2005, claimant was administered a "Mini-Mental State Examination" by Dr. Mikell. (Tr. 413.) Although claimant scored well (26 out of 30, considered "mild" cognitive impairment), Dr. Mikell noted that he had begun "to have difficulty with his thinking." (Id.) Although he "still [had] a slight left field deficit," she felt it was "minor and it [was] safe for him to drive." (Id.) She also noted her concern that claimant was "starting to get a little dementia." (Id.) On March 24 and 27, 2006, claimant underwent a neuropsychological evaluation by Dr. Daniel B. Nagelberg, to whom claimant had been referred by Dr. Mikell. (Tr. 353-62.) Nagelberg administered a variety of tests to assess claimant's mental status and noted that although claimant was a "functioning intellectual within the average range," there was "a marked difference" between his "verbal comprehension and perceptual-organizational skills, the former falling within the severe range and the latter falling within the low average range." (Tr. 361.) Moreover, claimant scored "within the borderline range on an index of working

memory (sustained concentration and attention) and the low average range on an index of psychomotor processing speed." (Id.) He performed better with respect to auditory—rather than visual—memory, and his spelling and arithmetic levels were at the low end of the average range. (Id.) On the "battery of tests sensitive to brain impairment," Nagelberg concluded that claimant's scores were "consistent with a 'severe' degree of neuropsychological impairment though there is a strong pattern of lateralization with most of the impairments associated with the right hemisphere (consistent with a stroke)." (Id.) He diagnosed claimant as having a "cognitive disorder secondary to stroke" and determined that his "status post stroke" included a "left visual field defect, history of seizures, [and] hypertension." (Id.) Nagelberg opined that claimant was "clearly not employable" and that he did "not expect much change in the future." (Id.)

During an appointment with claimant in April 2006, Dr. Mikell noted that claimant "look[ed] good" and was "walking well," and also that he had not recently had any seizures. (Tr. 411.)

## C.     State Medical Examiners

Upon referral by the Disability Adjudication Services ("DAS"), claimant underwent a psychological evaluation by Dr. Arthur W. Hartzell on January 4, 2002. (Tr. 134-40.)   In the evaluation report, Dr. Hartzell summarized discussions he had with claimant and concluded that claimant's general demeanor was "appropriate," but he noted that claimant became "frustrated with his own abilities" during the testing session. (Tr. 137.)   Hartzell's tests revealed "a significant discrepancy between verbal and performance abilities . . . with performance being lower." (Tr. 138.)   He explained that this finding was consistent with claimant's history of stroke, right brain, affecting his left side. (Id.)   He also diagnosed claimant with Cognitive Disorder NOS since he showed significant cognitive decline in some areas, though he noted that claimant did not meet the criteria for vascular dementia. (Tr. 140.)   Dr. Hartzell concluded that claimant was "able to maintain concentration and attention to tasks," could "remember and follow instructions, either simple or complex," and would be able to "interact with co-workers, supervisors, and/or the public . . . and adhere to a work schedule and meet production norms in many tasks." (Id.)   Dr. Hartzell did note,

however, that "claimant shows a cognitive decline in certain types of abilities, specifically those associated with right brain function, and would have difficulty in a job which required those abilities (e.g. math skills, performance skills affected)." (Id.)

On May 5, 2004, the state had Dr. Leslie Glover, its consultant, render an "internal medicine report." (Tr. 186-89.) She noted that claimant "ambulates well" and "is able to get on and off the exam table with no difficulty and up and out of the chair with no difficulty." (Tr. 188.) She found that claimant suffered from "hypertension," "possible depression," "seizure disorder," and had a "left-sided peripheral visual field deficit." (Tr. 189.) She also concluded, however, that she noticed "no coordination deficits," "no range of motions deficits," and no deficits "with regard to sitting for extended periods, walking, standing, bending, seeing, hearing, speaking, or following simple instructions." (Id.)

On June 18, 2004, Dr. O. Awe, a DAS consultant, assessed claimant's physical residual functional capacity. (Tr. 190-98.) Dr. Awe found that claimant could lift and carry up to 50 pounds occasionally and up to 25 pounds frequently, stand and/or walk and sit (with breaks) for about six hours out of an eight-hour work day, and push and/or pull on

an unlimited basis. (Tr. 191.) Moreover, he found claimant could only occasionally climb a ladder/rope/scaffold, but could "frequently" balance, stoop, kneel, crouch, and crawl. (Tr. 192.) He found no manipulative or communicative limitations, and no visual limitations, with the exception of the limitation in claimant's field of vision. (Tr. 193-94.) The only environmental limitation listed was that claimant should "avoid concentrated exposure" to "hazards" such as machinery and heights. (Tr. 194.) In examining claimant's symptoms, Dr. Awe found that "the severity or duration of the symptom(s) . . . is disproportionate to the expected severity or expected duration on the basis of the claimant's medically determinable impairment(s)" and that his symptoms of seizure, visual and coordination difficulties were "potentially credible based on objective evidence." (Tr. 195.) In conclusion, Dr. Awe stated that he gave "minimal opinion weight" to Dr. Glover's finding that claimant is unable to drive, because he felt that claimant's seizures were well-controlled, but he gave greater weight to Dr. Glover's determination that claimant had no deficit in his ability to walk, sit, stand, bend, see, hear, and speak. (Tr. 196.)

On June 30, 2004, the state had its consultant Dr. Jeffrey Vidic assess claimant's psychiatric health. (Tr. 199-212.) He concluded that claimant had an impairment, though "not severe," and that the disorder fell within category "12.06 Anxiety-Related Disorders." (Tr. 199.) He noted that this disorder is "controlled with med[ication]." (Tr. 204.) Specifically, he found that claimant suffered no restriction on daily living activities, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Tr. 209.) He also determined claimant to be only "partially credible," because many of his claimed limitations and required treatments were not supported by the actual symptoms, the "evidence of record," and/or Awe's own observations. (Tr. 211.)

On January 31, 2005, Dr. Phillip Gertler, a non-examining DAS consultant, rendered a second physical residual functional capacity assessment. (Tr. 221-28.) He made the same findings as Dr. Awe, with relatively few exceptions. Gertler found that claimant could never climb a ladder/rope/scaffold (whereas Awe concluded that he could occasionally do so), that he should not drive a vehicle because of vision problems, and

that he should avoid all exposure to hazards, such as machinery and heights, in his environment (while Awe said he should avoid "concentrated exposure"). (Id.) Gertler also concluded that claimant had "only visual and slight seizure problems" and that he was "potentially credible." (Tr. 226.)

On February 1, 2005, Dr. John Petzelt, on behalf of DAS, completed a "Psychiatric Review Technique Form" concerning claimant. (Tr. 229-43.) He determined that claimant's disability was "not severe" and fell within the category "12.04 Affective Disorders." (Tr. 229.) Specifically, he determined that claimant suffered from a "disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by . . . mild depression [and] anxiety." (Tr. 232.) He found mild limitations in claimant's daily living activities, ability to maintain social functioning, and ability to maintain concentration, persistence, or pace. (Tr. 239.)

### D. Hearing Testimony

At a hearing before the ALJ on September 18, 2006, claimant testified that he had his first stroke in 1997 but went back to work through January 2002. (Tr. 443-44.) He testified that he made no

income in 2002. (Id.) The next year, however, he began collecting rent and back rent from the company ($2,500 in 2003; $8,200 in 2004; and $8,800 in 2005), since he co-owned the building that housed the company. (Tr. 444-45.) He testified that when he returned to work after his first stroke, he required at least a two-hour nap every day. (Tr. 450-52.) He reported having his first seizure while he was at work, sometime after his first stroke. (Tr. 449-50.) He theorized that the seizure was prompted by stress at work. (Id.) When questioned about his current physical abilities, he noted that he cannot perform his previous job as a traveling salesman because he no longer drives, he cannot carry the heavy product samples, and his problems with math make it difficult for him to safely calculate and suggest the appropriate type of lifting apparatus for a client's specific load size. (Tr. 448-49.) Claimant testified that he has problems remembering oral instructions, he cannot work for more than two hours straight, and when he tries to read, the lines often blur together so he has to lay a ruler under each line to focus on it. (Tr. 451-53.) He no longer hunts or fishes as he used to, claiming that people are hesitant to take him because he may injure himself or

others. (Tr. 455.) He has trouble performing household chores because of his limited use of his left side. (Tr. 456.)

After claimant answered questions from the ALJ and his own attorney, the ALJ qualified the vocational expert, Dr. Paul R. Dolan, who, with the ALJ's assistance, asked claimant several follow-up questions regarding the activities he performed as a traveling salesman. (Tr. 460-65.) Claimant explained that his job had required climbing ladders and cranes that stood over 160 feet in height. (Tr. 461.) He also discussed the level of authority he held in the company before the stroke, stating that prior to the stroke he could decide which clients the company focused its sales efforts upon. (Tr. 465.) After the stroke, however, he had no such decision-making authority. (Id.)

Dr. Dolan then discussed claimant's past relevant work and determined that in light of his present visual limitations and his need to be restricted from hazardous environments, he could not return to that work. (Tr. 471.) He indicated, however, that even with those limitations claimant could take a job as a "bus person," food service worker in a hospital, counter supply worker, or "hand packager." (Id.) He testified that there were thousands of such jobs in the region. (Id.) When asked if

claimant could perform such work if the ALJ found that claimant now operated at a limited (sixth or seventh grade) education level, would have to take a one-hour break in the morning and the afternoon, and would miss several days of work per month due to fatigue, Dr. Dolan replied that he could not perform any job in the national economy. (Tr. 394-95.)

Claimant's attorney then questioned Dr. Dolan and presented him with a hypothetical involving Dr. Nagelberg's findings (a "severe degree of neurological impairment . . . mood . . . [and] cognitive disorder[s] secondary to a stroke... [and] a 71 impairment on the general NDS psychological scale"). (Tr. 474.) Rather than having Dr. Dolan answer, however, the ALJ chose to "find administratively that an individual with those additional restrictions . . . could not sustain work on a regular and sustained basis." (Id.)

## II.  ANALYSIS

Affirmance of the ALJ's decision is mandatory if the ALJ's conclusions are supported by substantial evidence and based upon an application of correct legal standards. 42 U.S.C. § 405(g); Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002); Lewis v. Callahan, 125

F.3d 1436, 1439 (11th Cir. 1997). "Substantial evidence is something more than a mere scintilla, but less than a preponderance." <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1210 (11th Cir. 2005) (quotation marks and citations omitted). It "is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Crawford v. Comm'r of Soc. Sec.</u>, 363 F.3d 1155, 1158 (11th Cir. 2004) (quotation marks and citations omitted). If substantial evidence supports the decision, the Court will affirm "[e]ven if the evidence preponderates against the Commissioner's findings." <u>Id.</u> at 1158-1159. The substitution of this Court's judgment for that of the Commissioner is not allowed. <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1357-1358 (11th Cir. 1991).

The burden of proving disability lies with the claimant. 20 C.F.R. § 404.1512; <u>Moore v. Barnhart</u>, 405 F.3d 1208, 1211 (11th Cir. 2005). To determine whether claimant has met his burden of proof, the Court looks to the five-step evaluation process set forth in the Social Security Regulations. 20 C.F.R. § 416.920; <u>Jones v. Apfel</u>, 190 F.3d 1224, 1228 (11th Cir. 1999). At step one, the claimant must prove that he has not engaged in substantial gainful activity. <u>Jones</u>, 190 F.3d at 1228. At step two, he must demonstrate a severe impairment or combination of

impairments. Id. Then, at step three, if the claimant's impairment meets or equals a listed impairment, he is automatically found disabled. Id. If not, he must advance to step four, which requires him to prove an inability to perform past relevant work. Id. If he cannot perform past relevant work, stage five shifts the burden to the Commissioner to show that "there is other work available in significant numbers in the national economy that the claimant is able to perform." Id.

After the hearing, the ALJ found that claimant satisfied step one of the five-step analysis because claimant had not engaged in substantial gainful activity at any time relevant to the decision. (Tr. 17.) Regarding step two, the ALJ concluded that the medical evidence indicated that claimant suffered several severe impediments: "cerebrovascular accident (stroke) residuals, seizures when not compliant taking medications, no left eye peripheral vision, and slowing of processing visual information." (Tr. 17-18.) At step three, the ALJ held that claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.) Accordingly, the ALJ considered whether claimant retained the residual functional capacity to perform his past relevant

work. (Tr. 19.) The ALJ determined that while claimant could not do so, he could perform a limited range of work in the "unskilled medium occupational base," in particular those jobs enumerated by the vocational expert at the hearing, and that such jobs are available in sufficient numbers in the national economy. (Tr. 19-20.) Accordingly, the ALJ found that claimant was not disabled under the Act. (Tr. 20.)

Claimant contends that the ALJ erred in determining at step three that claimant did not automatically qualify as disabled. (Doc. 9 at 16-17.) Specifically, claimant avers that the medical evidence established that his impairments meet or equal Listing 11.04, "Central nervous system vascular accident," which requires claimant to show that "more than three months post-vascular accident" he suffered one of the following:

    (A)    Sensory or motor aphasia resulting in ineffective speech or communication; or

    (B)    Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station.

20 C.F.R. Part 404, Subp't P. App'x 1, § 11.04.

Claimant contends that his "history of strokes, and resultant medical, physical and neurological conditions" should "constitute a

central nervous system vascular accident with qualifying post-vascular symptoms as set forth in ¶ 11.04" and that the ALJ's determination to the contrary is "not supported by substantial evidence." (Tr. 17.) In support of this contention, claimant relies heavily on the findings of Dr. Nagelberg and also on some statements by Drs. Hartzell and Mikell. (Doc. 9 at 18-22.) Claimant alleges that the ALJ relied too heavily on the opinion of one doctor, Dr. Glover, and that he should have placed more weight in the other doctors' findings. (Id. at 23.) Additionally, he claims that his own testimony at the hearing is significant to the determination and should be given stronger consideration. (Id.) As claimant's conditions do not fit either of the listing's qualifications, the ALJ did not err in concluding that the record did not justify a finding of disability at step three.

1. *Sensory or Motor Aphasia Resulting in Ineffective Speech or Communication*

In support of his contention that he meets subpart (A) of listing 11.04, claimant primarily references test results summarized by Dr. Nagelberg, who performed a neuropsychological evaluation on claimant. First, on the speech-sounds perception test, which requires a patient to "perceive a spoken stimulus through hearing and relate the perception

through vision to the correct configuration of the letters on a test form," claimant's score fell within the "severe range of impairment." (Id.; Tr. 359.) On the seashore-rhythm test, which "measures the ability to discriminate variations in rhythmical patterns," claimant scored within the "mild to moderate range of impairment." (Doc. 9 at 3; Tr. 359.) Claimant points to Nagelberg's conclusion that there was "a marked difference between [claimant's] verbal comprehension and perceptual-organizational skills, the former falling within the superior range, and the latter falling within the low average range," and that he "scored within the low average range on an index of psychomotor processing speed." (Doc. 9 at 20; Tr. 356.) Claimant also emphasizes the conclusion of Dr. Hartzell that claimant "does show a significant cognitive decline in some areas—specifically right brain strengths and therefore, Cognitive Disorder NOS diagnosed." (Doc. 9 at 20; Tr. 140.) Finally, claimant points out his own testimony at the hearing. He cites a passage from the hearing transcript in which he explains his "problem with comprehension" which causes him to pronounce words incorrectly and to not always "comprehend what . . . is read and needs to be done." (Doc. 9 at 20-21.) Later at the hearing, he responded affirmatively when asked if

he has problems remembering and carrying out oral instructions that are given to him.  (Id. at 21.)

### 2.  *Disorganization of Motor Function in Two Extremities*

Claimant alleges that certain evidence shows that he has "significant and persistent disorganization of motor function in at least two extremities—impairment of his left hand (an extremity), his left ear (an extremity) and his lower body" and that "[t]his causes him loss of equilibrium."  (Id. at 21.)  He cites statements by Drs. Nagelberg and Mikell as supporting a finding that he meets subpart (B) of listing 11.04.  First, Dr. Nagelberg reported that test results regarding hearing in claimant's left ear were within the "severe range of impairment."  (Doc. 9 at 22; Tr. 358.)  As proof of sufficient impairment in his left hand, claimant again cites test results summarized by Dr. Nagelberg showing "extremely poor score[s]" on "finger-tip number writing perception" and "tactile finger recognition" tests that fell "within the severe range of impairment," with far more errors made with his left hand.  (Doc. 9 at 22; Tr. 358.)  He also cites a statement by Dr. Mikell that "we have never been able to get him to a good equilibrium."  (Doc. 9 at 22-23; Tr. 272.)

Finally, regarding his lower body and equilibrium problems, claimant includes a portion of his hearing testimony in which he explained, "[W]hen I go to move my left side—my left side and my right side don't get together [in my brain]." (Doc. 9 at 22; Tr. 450.)

Even if the statements that claimant cites could support a finding that claimant meets subparts (A) and/or (B) of listing 11.04, there was substantial evidence to support the ALJ finding that claimant did not satisfy the listing's requirements. While it is true that the ALJ relied more heavily on Dr. Glover's findings, he did not ignore the findings of the other physicians. Moreover, the ALJ was justified in relying more heavily on some physicians than on others.

The ALJ summarized the findings of Dr. Glover, who rendered an internal medicine report for DAS following a physical examination of defendant, noting specifically her findings that claimant had "no coordination deficits [during the] examination," claimant's seizure disorder was "well controlled with medication," he had "left-sided peripheral visual field deficit and hypertension," and "no range of motion deficits." (Tr. 17.) Furthermore, claimant had "no deficits regarding sitting for extended periods of time; and no restrictions on walking,

standing, bending, seeing, hearing, speaking, or following simple instructions." (Id.)

The ALJ did, however, also note the findings of several other physicians. For instance, he restated the findings of the consultative ophthalmology evaluation by Dr. Piros, who found that claimant "had a cerebrovascular accident which resulted in severe vision loss with a complete left hemianopic defect," but that he had "otherwise a normal ocular exam in both the right and left eyes." (Id.) The ALJ also included a statement by Dr. Mikell, claimant's treating neurologist, following a May 24, 2005 visit with claimant, where she had commented that claimant "had a slight left field deficit but it was minor, and it was safe for him to drive." (Id.) Finally, the ALJ briefly addressed the opinion of Dr. Nagelberg who ultimately found that claimant was "permanently disabled" and "definitely should not drive." (Tr. 18.) The ALJ stated that he "discount[ed] Dr. Nagelberg's opinion of claimant being permanently disabled" based on the fact that (1) the doctor had not found many deficits in claimant, (2) the claimant had worked for several years following his stroke, and (3) the doctor's findings were

"contradicted by the findings of other physicians such as his treating neurologist, Dr. Mikell." (Id.)

"Generally, the opinions of examining physicians are given more weight than those of non-examining physicians, treating physicians' [opinions] are given more weight than those of physicians who examine but do not treat, and the opinions of specialists are given more weight on issues within the area of expertise than those of non-specialists." McNamee v. Soc. Sec. Admin., 164 F. App'x 919, 923 (11th Cir. 2006) (citing 20 C.F.R. § 404.1527(d)(1), (2) & (5)). However, an ALJ can accord more or less weight to a particular source if there is good cause to do so. See Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991).

Here, Dr. Nagelberg was not a treating physician; he had only one two-day session with claimant for the purpose of rendering a neuropsychological evaluation. The opinions of a one-time examiner are not entitled to special weight in a disability determination. McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987); Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986). Moreover, the ALJ explained that many of Nagelberg's findings were contradicted by the findings of other physicians—including some opinions of Dr. Mikell—and that he placed

greater reliance upon those more consistent findings. (Tr. 18.) Under Eleventh Circuit case law, it was not improper for the ALJ to afford the conclusions of a non-treating, one-time examining physician less weight than the opinions of the other physicians that were more consistent with one other.

Next, Dr. Hartzell, who interviewed claimant on one occasion and rendered a psychological evaluation, is subject to the same standard as Dr. Nagelberg. (Tr. 134-40.) As a one-time examiner, his opinion was not entitled to any special weight by the ALJ, McSwain, 814 F.2d at 619, so the ALJ was free to contrast Hartzell's findings with those of the other physicians and assign less weight to Hartzell's findings. Although the ALJ did not specifically reference Dr. Hartzell's evaluation in his decision, there is no evidence to suggest that he did not consider it in reaching his ultimate conclusion.[4]

Dr. Mikell was claimant's treating neurologist who saw him every few months beginning in late 1998. The ALJ obviously considered Dr.

---

[4] The Court notes that Hartzell's conclusions fully support the ALJ's decision, as he found that claimant would be able to interact in a work environment, to adhere to a work schedule, remember and follow instructions, and maintain concentration and attention to tasks. (Tr. 140.) Claimant desires that Hartzell's statement that claimant showed "significant cognitive decline in some areas" be given more weight. But taken as a whole, Dr. Hartzell's conclusions lent further support to the ultimate finding of no disability.

Mikell's records and opinions, as he made specific reference to them in explaining his decision to discount the opinion of Dr. Nagelberg. (Tr. 18.) Claimant, however, alleges that the ALJ should have given more weight to a particular statement Dr. Mikell made that he feels supports his allegation that he met the qualifications for "disorganization of two motor function in two extremities" (subpart (B)), as it discusses his problems with his equilibrium:

> Mr. Armstrong returns today and is having a lot of difficulty. . . . We have never been able to get him a good equilibrium. I am afraid there is not much more we can do but we will watch his Dilantin level very carefully. His field cut is just not going to go away. I think he has some mild cognitive deficits too, but I did not test him formally.

(Tr. 272.)

"A treating physician's report 'may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.'" Crawford, 363 F.3d at 1159 (quoting Edwards, 937 F.2d at 583-84). Here, Dr. Mikell was hypothesizing about problems she thought or was "afraid" that claimant suffered. She did not report any specific tests she had performed to determine if her suspicions were true. Moreover, her comment about not being able to get claimant at a "good" equilibrium is a vague description of his condition and not a factually supported

diagnosis. Finally, it appears from Dr. Mikell's later records that claimant's equilibrium issues improved or, at least, did not worsen in the years following the quoted 2001 statement. For instance, following a May 2005 visit with claimant, Dr. Mikell determined that it was "safe for [claimant] to drive." (Tr. 413.) Almost a year later, she commented that during her visit with claimant that day he had "look[ed] good" and was "walking well." (Tr. 411.) The ALJ was not required to give Dr. Mikell's earlier quoted statement more weight than any of her other later statements, especially when her statements were not supported by objective medical evidence and when her later statements imply improvement in the originally noted conditions. The ALJ properly considered Dr. Mikell's medical records and conclusions concerning claimant.

Finally, claimant takes issue with the ALJ's heavy reliance on the opinion of Dr. Glover, a state consultant, which he claims is contrary to the opinions of claimant's other physicians.[5] (Doc. 9 at 23.) "The ALJ is required to consider the opinions of non-examining state agency medical

---

[5] Dr. Glover, however, was not the lone physician upon whom the ALJ relied. The ALJ stated in his report that he had "considered and given appropriate weight to the opinions of the State Agency medical and psychological consultants and other program physicians and psychologists as non-examining sources." (Tr. 19.)

and psychological consultants because they 'are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.'" Milner v. Barnhart, 275 F. App'x 947, 948 (11th Cir. 2008) (citing 20 C.F.R. § 404.1527(f)(2)(i)). The ALJ may rely on the opinions of non-examining sources when they do not conflict with those of examining sources. Edwards v. Sullivan, 937 F.2d 580, 584-85 (11th Cir. 1991). Here, the State Agency consultants Awe and Gertler found that claimant could perform medium exertional work and had no communicative or manipulative limitations, which was consistent with the opinions of Dr. Hartzell and Dr. Glover, who both examined claimant. (Tr. 19.) Thus, the ALJ considered and afforded the appropriate weight to each of the doctors who provided opinions about claimant. He did not err in not giving special weight to the specific portions of the record cited by claimant.

In conclusion, the ALJ's assessment that claimant did not suffer either sensory or motor aphasia resulting in ineffective speech or communication (subpart (A) of listing 11.04), and/or disorganization of motor function in at least two extremities (subpart (B) of listing 11.04) was based on substantial evidence. As to subpart (A), several physicians

assessed claimant's mental health and commented directly or indirectly on his communicative abilities. (Tr. 138, 199, 209, 229, 243, 413.) Dr. Hartzell concluded that claimant was "able to maintain concentration and attention to tasks," could "remember and follow instructions, either simple or complex," and would be able to "interact with co-workers, supervisors, and/or the public... and adhere to a work schedule and meet production norms in many tasks." (Tr. 138.) Although Dr. Hartzell did note that "claimant shows a cognitive decline in certain types of abilities," he explained that the abilities affected were those associated with right brain function, such as "math skills [and] performance skills." (Id.) Additionally, the "Mini-Mental State Examination" that Dr. Mikell administered to claimant in 2005 showed that he had only "mild cognitive impairment." (Tr. 413.) Drs. Awe and Gertler found no communicative limitations. (Tr. 194, 225.) Finally, Drs. Vidic and Petzelt both found that claimant had a non-severe impairment resulting in only mild limitations on claimant's daily living activities and social functioning. (Tr. 199, 209, 229, 243.) As to subpart (B), Dr. Glover's examination revealed "no range of motion deficits" and "no restrictions on . . . hearing." (Tr. 17.) Drs. Awe and Gertler determined that

claimant could perform medium exertional work, could lift and carry up to 50 pounds occasionally and 25 pounds frequently, and that he had "no manipulative limitations." (Tr. 191, 193, 222, 224.) Although on two occasions Dr. Mikell commented that claimant was experiencing numbness in his left side, she also commented that despite the numbness, claimant was experiencing "no weakness" on that side. (Tr. 274, 275.) Accordingly, substantial evidence supports the ALJ's determination that claimant did not meet either of the qualifiers for disability under listing 11.04 and that he retained the capacity to perform work available in the national economy.

## III.  CONCLUSION

Based on the foregoing, the decision of the Commissioner should be **AFFIRMED**.

**SO REPORTED AND RECOMMENDED** this  29th  day of October, 2008.

/s/ G.R. SMITH
**UNITED STATES MAGISTRATE JUDGE**
**SOUTHERN DISTRICT OF GEORGIA**